Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| ELVIN DE JESÚS OLIVENCIA<br><br>Recurrido<br><br>V.<br><br>HONEYWELL AEROSPACE DE PUERTO RICO<br><br>Peticionaria | KLCE202401215 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Aguadilla<br><br>Caso Núm.:<br>AG2020CV00163<br><br>Sobre:<br>Despido injustificado |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Marrero Guerrero.

Marrero Guerrero, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 25 de febrero de 2025.

Comparece ante nos Honeywell Aerospace de Puerto Rico, Inc. (Honeywell o peticionaria) en solicitud de que revisemos una *Resolución* emitida el 19 de septiembre de 2024 por el Tribunal de Primera Instancia, Sala Superior de Aguadilla (TPI).[1] En el referido dictamen, el TPI denegó la *Moción de Sentencia Sumaria* que Honeywell presentó para desestimar con perjuicio la *Querella* que presentó el señor Elvin De Jesús Olivencia (señor De Jesús Olivencia o recurrido).

Por los fundamentos que se exponen a continuación, se adelanta la expedición del auto de *certiorari* y la revocación del

---

[1] Apéndice del *Recurso de Certiorari*, Anejo 10, págs. 459-468. Archivada y notificada el 20 de septiembre de 2024. El 2 de octubre de 2024, Honeywell solicitó reconsideración, la cual el TPI declaró No Ha Lugar mediante una *Resolución* emitida del 7 de octubre de 2024.

dictamen recurrido. Por consiguiente, se desestima la causa de acción en contra Honeywell.

Veamos el trasfondo fáctico y procesal que sostiene nuestra determinación.

**I.**

La controversia ante nuestra consideración tuvo su origen el 7 de febrero de 2020, fecha en que el señor De Jesús Olivencia presentó una *Querella* contra Honeywell por despido injustificado[2] y represalias en el empleo[3] mediante el procedimiento sumario de reclamaciones laborales, al amparo de la *Ley de procedimiento sumario de reclamaciones laborales*, Ley Núm. 2 de 17 de octubre de 1961, según enmendada, 32 LPRA sec. 3118 *et seq.*[4] En esta, el recurrido alegó que el 21 de mayo de 2018 comenzó a laborar en Honeywell en el puesto de *Senior Software Engineer*. Señaló que, debido a su desempeño satisfactorio, recibió un aumento salarial en enero de 2019.

Sin embargo, el señor De Jesús Olivencia arguyó que su supervisor, el señor Edwin Ortiz (señor Ortiz), comenzó a fomentar un ambiente de acoso laboral diario por celos profesionales. Sobre el particular, el recurrido sostuvo que la conducta agresiva del señor Ortiz conllevó que requiriera atención médica por estrés e hipertensión. Ante ello, puntualizó que el 3 de mayo de 2019 y el 1 de agosto de 2019 le notificó a la señora Bosques del área de Recursos Humanos de Honeywell sobre el trato hostil que recibió por parte del

---

[2] *Ley de indemnización por despido sin justa causa*, Ley Núm. 80 del 30 de mayo de 1976, según enmendada, 29 LPRA sec. 185 a *et seq.*
[3] *Ley contra el despido injustificado o represalias a todo empleado por ofrecer testimonio ante un foro legislativo, administrativo o judicial*, Ley Núm. 115-1991, según enmendada, 29 LPRA sec. 194 *et seq.*
[4] Entrada Núm. 1 en el expediente digital del caso AG2020CV00163 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

señor Ortiz, pero que la empresa no tomó medida alguna. El recurrido esgrimió que acto seguido, recibió una calificación desfavorable de *stalled* en la evaluación anual correspondiente al año anterior. Además, señaló que el señor Ortiz le envió un comunicado sobre unas áreas de incumplimiento en su deber, por lo que lo refirió a un *Personal Improvement Plan* (PIP). El señor Ortiz Olivencia alegó que respondió mediante una comunicación en la que detalló que las aseveraciones del señor Ortiz eran incorrectas y mal intencionadas.

Según el recurrido, dicho evento provocó una recaída en su hipertensión, lo que requirió tomar un período de descanso ordenado por el médico desde el 12 de agosto de 2019 hasta el 13 de septiembre de 2019. Precisó que, a su regreso, el señor Ortiz ya no fungía como su supervisor. No obstante, el señor De Jesús Olivencia manifestó que para salvaguardar su salud física y emocional no le quedó más alternativa que renunciar a su empleo el 14 de noviembre de 2019 por recomendación médica. Apuntó que dicha renuncia alegadamente involuntaria constituyó un despido injustificado, por lo que reclamó una suma igual a un año de salario por concepto de represalia o $26,538.46 en concepto de mesada ante un presunto despido constructivo, entre otras sumas.

El 5 de julio de 2022, el señor De Jesús Olivencia presentó una *Segunda Querella Enmendada*.[5] Mediante esta, agregó entre sus alegaciones que dentro de las funciones de supervisor del señor Ortiz se encontraba celebrar reuniones *One on One* para dar apoyo al empleado, así como monitorear su trabajo para identificar sus destrezas y deficiencias. Empero, concretó que el señor Ortiz no efectuó dichas reuniones con su persona. En cambio, esgrimió que

---

[5] Apéndice del *Recurso de Certiorari*, Anejo 1, págs. 1-10.

su supervisor les llamaba la atención frente a sus compañeros de trabajo en las reuniones semanales grupales y le asignaba tareas que estaba fuera de su especialidad.

Entre sus alegaciones enmendadas, el señor De Jesús Olivencia aludió que el trato alegadamente hostil del señor Ortiz repercutió en que tuviese que recibir atención médica en múltiples ocasiones por hipertensión. Asimismo, adujo que en múltiples ocasiones notificó a Honeywell sobre el comportamiento del señor Ortiz sin que la empresa actuara. Por el contrario, arguyó que se tomaran acciones en su contra como el PIP, deterioro en las condiciones de empleo, humillaciones y vejámenes. Por lo anterior, indicó que Honeywell, por medio del señor Ortiz, creó un ambiente hostil que lo indujo a renunciar el 14 de noviembre de 2019 para salvaguardar su salud física y emocional.

El 22 de julio de 2022, Honeywell presentó una *Contestación a segunda querella enmendada*.[6] En la misma, la peticionaria sostuvo que en vista de que el desempeño del señor De Jesús Olivencia se encontraba por debajo de las expectativas de su puesto, recibió evaluaciones negativas y fue colocado en un PIP. Asimismo, afirmó que el señor De Jesús Olivencia se quejó del trato de su supervisor, pero pormenorizó que al realizar una investigación interna se validaron las deficiencias que se le señalaron y no se encontró apoyo para sostener sus alegaciones de celos profesionales. Pese a lo anterior, el peticionario alegó que tomó medidas afirmativas y proactivas para que el señor Ortiz mejorara su estilo de supervisión y comunicación con sus empleados. A su vez, arguyó que cualquier condición de salud que tuviese el recurrido no fue producto de alguna

---

[6] *Íd.*, Anejo 2, págs. 11-25.

conducta ilegal por parte de la empresa. Honeywell señaló que la renuncia del señor De Jesús Olivencia fue libre, voluntaria y motivada por razones personales, máxime cuando el señor Ortiz ya había dejado de ser su supervisor desde octubre de 2019. Además, subrayó que previo al señor De Jesús Olivencia renunciar a Honeywell, aceptó una oferta de empleo con otro patrono por mayor remuneración. Al entender que el recurrido no fue despedido, el peticionario adujo que en este caso no era aplicable la alegación de despido injustificado ni represalia.

El 23 de octubre de 2023, el TPI emitió una *Resolución* en la que convirtió el caso al procedimiento ordinario.[7]

Tras varios trámites procesales, el 23 de julio de 2024, Honeywell presentó una *Moción de Sentencia Sumaria.*[8] En esencia, el peticionario planteó que la causa de acción en su contra se debía desestimar, dado que el señor De Jesús Olivencia no fue despedido por la empresa, sino que renunció a su empleo para ocupar una plaza similar con un salario mayor con otra compañía. Por motivo de lo anterior, el peticionario razonó que el recurrido tenía que renunciar a Honeywell por la imposibilidad física de trabajar a tiempo completo en dos (2) empresas. Honeywell destacó que el recurrido conocía al momento de renunciar que el señor Ortiz había dejado de fungir como su supervisor. Por otro lado, acentuó que al regresar de su período de licencia por enfermedad, el recurrido comenzó a ser supervisado por la señora Miriam Cruz, con quien tenía una buena y cordial relación. En atención a lo anterior, Honeywell precisó que siempre atendió las quejas del recurrido y orientó al señor Ortiz quien fue colocado en un

---

[7] *Íd.*, Anejo 3, pág. 26. Archivada y notificada el 24 de octubre de 2023.
[8] *Íd.*, Anejo 4, págs. 27-380.

curso de comunicación asertiva y removido de su puesto como supervisor del señor De Jesús Olivencia.

En torno a la alegación de represalias, el peticionario entendió que el señor De Jesús Olivencia no cumplió con el requisito de haber sido objeto de una acción adversa en el empleo. Sobre el particular, puntualizó que una evaluación desfavorable ni un programa de mejoramiento con era el PIP no constituían una acción adversa en el empleo ni una razón suficiente para renunciar.

Honeywell argumentó que no existía controversia sobre los siguientes hechos materiales, por lo que procedía la desestimación sumaria del pleito. A saber:

1) Honeywell es una compañía que se dedica, entre otras cosas, a la venta de piezas y equipo relacionado a proyectos de ingeniería para la industria de defensa y aeroespacial. [...]
2) Honeywell cuenta con un Departamento de Recursos Humanos. [...]
3) En todo momento relevante a la presente reclamación, la Sra. Loida Bosques (en adelante "Sra. Bosques") ocupaba el puesto de "*Senior Generalist*" de Recursos Humanos, y tenía a su cargo el manejo de los asuntos de personal provenientes del Departamento de Ingeniería. [...]
4) Honeywell cuenta con varias políticas de personal, entre las cuales figura el *Code of Business Conduct* de aplicación a todos sus empleados. [...]
5) El querellante podía acceder el *Code of Business Conduct* en cualquier momento a través del portal de intranet de la compañía o en la oficina de recursos humanos. [...]
6) El querellante tomó un entrenamiento sobre las disposiciones del *Code of Business Conduct* el 1 de noviembre de 2018. [...]
7) Honeywell evalúa a sus empleados a mediados y al final de cada año natural. [...]
8) La evaluación de fin de año se conoce como "*Performance Asses[s]ment*" y típicamente se discute con el empleado alrededor del mes de febrero del año siguiente al que está siendo evaluado. [...]
9) A la evaluación de mitad de año se le conoce como "*Mid Year Evaluation*" y típicamente se discute para el mes de agosto del año en curso. [...]
10) El sistema de evaluación que utiliza Honeywell examina el desempeño de los empleados en dos áreas principales, a saber, productividad ("*Results*") y comportamientos ("*Honeywell Behaviors*"). [...]
11) Cuando un empleado experimenta problemas con su desempeño en el trabajo, el mismo puede ser colocado en un *Performance Improvement Plan* (en adelante, "PIP").
12) Entre otras cosas, en el documento del PIP se identifican el/las área(s) que el empleado debe mejorar.
13) El querellante comenzó a trabajar para Honeywell el 21 de mayo de 2018, como "*Senior Software Engineer*" en el área de ATT. [...]

14) El área de ATT responde al Departamento de Ingeniería, el cual a su vez se encontraba dirigido por la Sra. Miriam Cruz (en adelante "Sra. Cruz"), quien ocupaba el puesto de "Manager" en dicho departamento. [...]

15) Como "*Senior Software Engineer*", el querellante tenía, entre otras cosas, la responsabilidad de diseñar, desarrollar e integrar funciones complejas de programas ("*software*") de informática. [...]

16) Los "*Sales Engineers*", por su parte, utilizan dichos programas ("*softwares*") para obtener información y visualizar la data que utilizan durante el proceso de ventas. [...]

17) Cuando el querellante comenzó a trabajar para Honeywell, el Sr. Edwin Ortiz (en adelante "Sr. Ortiz") ocupaba la plaza de "*Database* Sr. Administrador" en el Departamento de Información/Tecnología. [...]

18) Más adelante, el 13 de agosto de 2018, el Sr. Ortiz pasó a ocupar el puesto de "*Sr. General Engineering Supervisor*" en el Departamento de Ingeniería. [...]

19) Una vez el Sr. Ortiz pasa a ocupar el cargo de "*Sr. General Engineering Supervisor*", era a éste a quien le correspondía preparar, como parte de sus funciones, el "*Mid Year Review*" y el "*Performance Assessment*" del querellante. [...]

20) Debido a la naturaleza y estructura en la cual funciona Honeywell, el querellante recibía la mayor parte de sus asignaciones de trabajo de su "*Matrix Manager*", Pradeep Chandra, cuyas oficinas se encontraban localizadas en la India. [...]

21) Una vez el querellante recibía una tarea de trabajo, le correspondía realizar la misma directamente con el equipo de Honeywell en la India. [...]

22) En vista de que el Sr. Ortiz no estaba directamente involucrado en gran parte de los trabajos que realizaba el querellante, el "*feedback*" que recibía en torno al mismo, provenía principalmente de su "*Matrix Manager*" y del equipo de trabajo de la India. [...]

23) El Sr. Ortiz sostuvo varias conversaciones con el "*Matrix Manager*" del querellante, así como con otras personas del equipo del HTS en la India para discutir el desempeño del querellante. [...]

24) El insumo ofrecido por el "*Matrix Manager*" del querellante y el equipo de trabajo de la India, consistía en indicar, entre otras cosas, que no estaban satisfechos con el trabajo del querellante, y que estaban perdiendo la confianza en su capacidad para trabajar adecuadamente los asuntos que le eran asignados. [...]

25) Como resultado de la insatisfacción con el trabajo del querellante, su "*Matrix Manager*" tomó la determinación de removerlo de cualquier tarea relacionada a MAT tableau. [...]

26) El *Mid Year Review* del 2019 fue preparado por el Sr. Ortiz, quien se dejó llevar principalmente por el insumo que le fue brindado por el "*Matrix Manager*" del querellante, y el equipo de trabajo de la India que estuvo trabajando con el querellante. [...]

27) El miércoles 7 de agosto de 2019, el querellante recibió su *Mid-Year Evaluation* para el año 2019 y fue colocado en un PIP. [...]

28) El proceso de preparar el *Mid Year Review* del querellante y la posible colocación de éste en un *Performance Improvement Plan* (PIP), fue un asunto que se estuvo trabajando desde el 1 de julio de 2019. [...]

29) En el *Mid Year Review* del 2019 se indicó que el querellante había experimentado problemas con relación a cuatro (4) tareas específicas, a saber: i. *MAT Weekly with Monthly*

*FCS*; ii. *Tableau*; iii. *Pricing Database*; y iv. *NPD BI Flawless Lauch Database & Dashboard for PP&C.* [...]

30) El *Mid Year Review* del 2019, así como el PIP, fueron discutidos con el querellante mediante reunión celebrada el miércoles 7 de agosto de 2019, con el Sr. Ortiz de manera presencial y su *"Matrix Manager"*, Pradeep Chandra, quien compareció por teléfono desde su oficina en la India. [...]

31) Al querellante no se le cambió de puesto, ni se le alteró su salario, ni sus beneficios o responsabilidades como resultado de haber sido colocado en un PIP. [...]

32) El querellante acusó recibo de su PIP el mismo día en que lo recibió, a saber, [el] miércoles[,] 7 de agosto de 2019. [...]

33) El querellante acusó recibo del *Mid Year Review* de 2019 al día siguiente, [el] jueves[,] 8 de agosto de 2019. [...]

34) El viernes[,] 9 de agosto de 2019, el querellante no se reportó a trabajar.

35) El viernes[,] 9 de agosto de 2019, el querellante acudió a donde un médico, quien a su vez le recomendó descanso. [...]

36) Como resultado de lo anterior, a partir del 9 de agosto de 2019, el querellante fue colocado en descanso por Honeywell en virtud de una licencia por enfermedad con paga. [...]

37) Mientras el querellante se encontraba en la licencia médica en descanso con paga, el querellante aplicó a una plaza similar en Lockheed Martin. [...]

38) A los pocos días de haber enviado su aplicación de empleo, Lockheed Martin se comunicó con el querellante para una entrevista. [...]

39) El querellante sostuvo varias entrevistas de empleo con Lockheed Martin, la primera con el *"manager"* por teléfono y la segunda con el *"Lead"* mediante Skype. [...]

40) La segunda entrevista se llevó a cabo aproximadamente una semana después de haberse celebrado la primera. [...]

41) Unos pocos días después, se celebró una tercera entrevista con la representante de recursos humanos de Lockheed Martin.

42) El 13 de septiembre de 2019, el querellante recibió una oferta de empleo como *"Data Engineer"* en Lockheed Martin. [...]

43) El 14 de septiembre de 2019, el querellante retó los términos de su oferta de empleo con Lockheed Martin y el 17 de septiembre de 2019 recibió una oferta para la plaza de *"Senior Data Engineer"*, la cual aceptó ese mismo día. [...]

44) Como *"Senior Data Engineer"*, el querellante comenzó a trabajar en Lockheed Martin con un ingreso que excedía los noventa y tres mil dólares ($93,000.00) anuales, el cual era mayor al que tenía en Honeywell en ese momento, y con beneficios marginales muy similares. [...]

45) No fue sino hasta el martes[,] 12 de noviembre de 2019, mientras aún se encontraba en descanso en virtud de una licencia por enfermedad con paga en Honeywell, el querellante renunció a su empleo en Honeywell mediante correo electrónico. [...]

46) Según acordado por correo electrónico, el querellante comenzó a trabajar en Lockheed Martin el lunes[,] 18 de noviembre de 2019, esto es, tres (3) días laborables después de haber renunciado a su empleo en Honeywell. [...]

47) Para la fecha en que el querellante renuncia a su empleo en Honeywell, ya había aceptado empleo con su actual patrono, Lockheed Martin. [...]

48) Durante el periodo de poco más de tres (3) meses comprendido entre el 9 de agosto de 2019 (fecha en la cual

el querellante presentó su certificado médico recomendando descanso) y el 12 de noviembre de 2019, (fecha en la cual renunció a su empleo en Honeywell), el querellante estuvo fuera de la oficina disfrutando de una licencia médica en descanso con paga. [...]

49) Entre el 9 de agosto de 2019 y el 11 de agosto de 2019, el querellante utilizó y agotó su balance de días por enfermedad, y entre el 12 de agosto de 2019 y 11 de noviembre de 2019, estuvo utilizando su *Short Term Disability*. [...]

50) A partir del 7 de octubre de 2019, el Sr. Ortiz dejó de ser el supervisor del querellante. [...]

51) A partir del 7 de octubre de 2019, el querellante habría de estar nuevamente bajo la supervisión de la Sra. Cruz. [...]

52) La Sra. Cruz fungió como la supervisora del querellante cuando fue inicialmente contratado. [...]

53) Tal y como reconoció el querellante durante la toma de su deposición, a la fecha en que presentó su carta de renuncia, conocía que el Sr. Ortiz ya no era su supervisor, sino la Sra. Cruz. [...]

54) La Sra. Cruz fue quien escogió al querellante entre los candidatos que solicitaron para la plaza que le fue ofrecida en Honeywell. [...]

55) La Sra. Cruz fue quien suscribió la oferta de empleo que Honeywell le extendió al querellante. [...]

56) La relación del querellante con la Sra. Cruz fue descrita por éste de la siguiente manera: "bien cordial" y de "respeto, cordial y adecuad[a]". [...]

57) Tal y como reconoció el querellante durante su deposición, nunca tuvo "*issues*" en el empleo con la Sra. Cruz. [...]

58) El viernes[,] 3 de mayo de 2019, el querellante envió un correo electrónico quejándose del Sr. Ortiz. [...]

59) El Sr. Ortiz no fue copiado por el querellante en el correo electrónico del 3 de mayo de 2019. [...]

60) El lunes[,] 6 de mayo de 2019, la Sra. Bosques respondió al correo electrónico del querellante indicándole que habría de enviarle un "*meeting invite*" para discutir el asunto en detalle. [...]

61) El jueves[,] 9 de mayo de 2019, la Sra. Bosques se reunió personalmente con el querellante para discutir los asuntos levantados por éste en su correo electrónico del 3 de mayo de 2019. [...]

62) La Sra. Bosques entrevistó al resto de los empleados que supervisaba el Sr. Ortiz. [...]

63) De la investigación surgió que no existían quejas mayores en cuanto al ambiente de trabajo, y que el Sr. Ortiz siempre les brindaba el apoyo técnico que fuese necesario al equipo. [...]

64) Durante la investigación, dos empleados indicaron que hubo un intercambio de argumentos entre el Sr. Ortiz y el querellante. No obstante, uno de los empleados indicó que el querellante actuaba a la defensiva, y otro dijo que el querellante no reconocía al Sr. Ortiz como una figura de "supervisión". [...]

65) Tras la reunión con los empleados, la Sra. Bosques se reunió con la Sra. Cruz para que ésta orientara al Sr. Ortiz en cuanto a su estilo de comunicación y expectativas de la empresa con relación a ello. [...]

66) El Sr. Ortiz desconocía que el querellante se había quejado de él, puesto [...] que la Compañía nunca le dijo que el Sr. De Jesús se había quejado de él. [...]

67) Según le fue requerido, la Sra. Cruz se reunió con el querellante para discutir su estilo de comunicación, las expectativas de la empresa con relación a ello, y las maneras en que podía mejorar el mismo. [...]

68) Honeywell también colocó al Sr. Ortiz en un curso de comunicación asertiva, el cual tomó el 18 de julio de 2019. [...]

69) La Sra. Bosques inclusive cotejó con la Sra. Ana Sánchez (en adelante "Sra. Sánchez"), quien ocupaba el puesto de "*Talent Management*" en Honeywell, para confirmar que el Sr. Ortiz hubiese asistido al curso. [...]

70) El 1 de agosto de 2019, el querellante envió una segunda comunicación quejándose del Sr. Ortiz. [...]

71) El Sr. Ortiz no fue copiado por el querellante en su mensaje del 1 de agosto de 2010. [...]

72) Entre el 3 de mayo y el 1 de agosto de 2019, el querellante no había presentado alguna otra queja en contra del Sr. Ortiz. [...]

73) El querellante se quejó del *Mid Year* y del PIP mediante correo electrónico del jueves[,] 8 de agosto de 2019. [...]

74) El mismo jueves[,] 8 de agosto de 2019, la Sra. Bosques se reunió con el querellante para discutir su queja. [...]

75) Como "*Sr. General Engineering Supervisor*", el Sr. Ortiz se encontraba bajo la dirección de la Sra. Cruz. [...]

76) Cuando el Sr. Ortiz comenzó como "*Sr. General Engineering Supervisor*", le aprobó un aumento de salario al querellante, y le concedió todo el tiempo libre que fue solicitado por éste, para atender el fallecimiento de su tía. [...]

77) Como "*Sr. General Engineering Supervisor*", el Sr. Ortiz nunca utilizó malas palabras para dirigirse al querellante, ni le faltó el respeto como persona. [...]

78) El querellante no cuestiona que el Sr. Ortiz fuese una persona muy conocedora de la cuestión técnica de su trabajo. [...]

79) El querellante no se queja de que el Sr. Ortiz le hubiese dado algún "*advice*" técnico malo o incompleto, la queja del querellante era con su forma de supervisar. [...]

El 23 de agosto de 2024, el señor De Jesús Olivencia presentó una *Moción en Oposición a Moción de Sentencia Sumaria.*[9] En síntesis, el recurrido planteó que la *Querella* no podía desestimarse por existir una clara controversia en los hechos 3, 11, 12, 15, 15, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 36, 37, 38, 45, 46, 48, 50, 51, 53, 62, 63, 64, 65, 66, 67, 68, 69, 72, 76, 77 y 79 y estar presentes cuestiones de intención y credibilidad que no podían ser dirimidas por el mecanismo de sentencia sumaria. En concreto, esbozó que los siguientes asuntos se encontraban en controversia:

1) La relación del supervisor[, el] Sr. Ortiz[,] con el querellante.
2) Si la empresa atendió las quejas presentadas por el querellante.

---

[9] *Íd.*, Anejo 7, págs. 384-455.

3) Si el querellante fue humillado en presencia de sus compañeros.

4) Si el querellante fue hostigado y acosado en su empleo por su supervisor.

5) Si la queja presentada por el querellante en contra de su supervisor ante Recursos Humanos y el corporativo es una actividad protegida.

6) Si las quejas presentadas por el Sr. Ortiz sobre hostigamiento y posteriores represalias fueron investigadas de forma imparcial.

7) Si el *Performance Improvement Plan* al que fue sometido el querellante subsiguientemente presentó una queja contra su supervisor fue legítimo o por represalia.

8) Si la renuncia del querellante fue la única alternativa para salvaguardar su salud emocional y física y por tanto constituye un despido constructivo.

9) Si el PIP constituye una medida caprichosa, arbitraria e irrazonable que provocó una condición onerosa para el empleado que fue inevitable la renuncia a su puesto.

10) Si el patrono impuso condiciones onerosas al querellante para obligarle a renunciar.

11) Si la determinación de poner al querellante en un PIP, justificado por alegado desempeño, constituye una medida caprichosa, arbitraria e irrazonable que provoc[ó] una condición onerosa para obligar al empleado a renunciar a su puesto y/o como represalia por presentar una queja ante recursos humanos.

12) Si procede dictar sentencia de forma sumaria en este caso aun cuando existen múltiples hechos que están en controversia y de los cuales se requiere dirimir la credibilidad de los testigos y partes en un juicio plenario.

Posteriormente, el 19 de septiembre de 2024, el TPI emitió una *Resolución.*[10] En esta, el Foro Primario declaró No Ha Lugar a la solicitud de sentencia sumaria de Honeywell. Esto, al concebir que existía una controversia real y genuina sobre los siguientes hechos que impedía dictar sentencia sumariamente:

1) Si la empresa atendió las quejas presentadas por el querellante de forma imparcial.

2) Si el querellante fue humillado en presencia de sus compañeros.

3) Si el querellante fue hostigado y acosado en su empleo por su supervisor.

4) Si la queja presentada por el querellante en contra de su supervisor ante Recursos Humanos y el corporativo es una actividad protegida.

5) Si las quejas presentadas por el empleado sobre hostigamiento y posteriores represalias fueron investigadas de forma imparcial.

6) Si el *Performance Improvement Plan* (PIP) al que fue sometido el querellante [que] subsiguientemente presentó una queja contra su supervisor fue legítimo o por represalia.

---

[10] *Íd.*, Anejo 10, págs. 459-468. Archivada y notificada el 20 de septiembre de 2024.

7) Si la renuncia del querellante fue la única alternativa para salvaguardar su salud emocional y física y por tanto constituye un despido constructivo.
8) Si el patrono impuso condiciones onerosas al querellante para obligarle a renunciar.
9) Si la determinación de poner al querellante en un PIP, justificado por alegado desempeño, constituye una represalia por presentar dos quejas ante recursos humanos.

Sobre el particular, el Foro Primario estableció que no era aconsejable utilizar el mecanismo de sentencia sumaria en ciertos casos laborales en los que existían elementos subjetivos de intención, propósito mental o negligencia o cuando el factor credibilidad era esencial. No obstante, formuló las siguientes determinaciones de hechos:

1) Honeywell es una compañía que se dedica, entre otras cosas, a la venta de piezas y equipo relacionado a proyectos de ingeniería para la industria de defensa y aeroespacial.
2) Honeywell cuenta con un Departamento de Recursos Humanos.
3) Honeywell cuenta con varias políticas de personal, entre las cuales figura el *Code of Business Conduct* de aplicación a todos sus empleados.
4) El querellante podía acceder el *Code of Business Conduct* en cualquier momento a través del portal de intranet de la compañía o en la Oficina de Recursos Humanos.
5) El querellante tomó un entrenamiento sobre las disposiciones del *Code of Business Conduct* el 1 de noviembre de 2018.
6) Honeywell evalúa a sus empleados a mediados y al final de cada año natural.
7) La evaluación de fin de año se conoce como "*Performance Asses[s]ment*" y típicamente se discute con el empleado alrededor del mes de febrero del año siguiente al que está siendo evaluado.
8) A la evaluación de mitad de año se le conoce como "*Mid Year Evaluation*" y típicamente se discute para el mes de agosto del año en curso.
9) El sistema de evaluación que utiliza Honeywell examina el desempeño de los empleados en dos áreas principales, a saber, productividad ("*Results*") y comportamientos ("*Honeywell Behaviors*").
10) El querellante comenzó a trabajar para Honeywell el 21 de mayo de 2018, como "*Senior Software Engineer*" en el área de ATT.
11) Los "*Sales Engineers*", por su parte, utilizan dichos programas ("*softwares*") para obtener información y visualizar la data que utilizan durante el proceso de ventas.
12) Cuando el querellante comenzó a trabajar para Honeywell, el Sr. Edwin Ortiz (en adelante[,] "Sr. Ortiz") ocupaba la plaza de "*Database Sr. Administrator*" en el Departamento de Informática/Tecnología.
13) Más adelante, el 13 de agosto de 2018, el Sr. Ortiz pasó a ocupar el puesto de "*Sr. General Engineering Supervisor*" en el Departamento de Ingeniería.
14) Una vez el Sr. Ortiz pasa a ocupar el cargo de "*Sr. General Engineering Supervisor*", era a éste a quien le correspondía

preparar, como parte de sus funciones, el *"Mid Year Review"* y el *"Performance Assessment"* del querellante.

15) Debido a la naturaleza y estructura en la cual funciona Honeywell, el querellante recibía la mayor parte de sus asignaciones de trabajo de su *"Matrix Manager"*, Pradeep Chandra, cuyas oficinas se encontraban localizadas en la India.

16) El 29 de abril de 2019[,] el querellante recibió atención médica y fue diagnosticado con hipertensión.

17) El viernes[,] 3 de mayo de 2019, el querellante presentó una queja en contra de su supervisor, [el] Sr. Ortiz, ante recursos humanos de la empresa mediante correo electrónico.

18) El Sr. Ortiz no fue copiado por el querellante en el correo electrónico del 3 de mayo de 2019.

19) El lunes[,] 6 de mayo de 2019, la Sra. Bosques respondió al correo electrónico del querellante indicándole que habría de enviarle un *"meeting invite"* para discutir el asunto en detalle".

20) El jueves[,] 9 de mayo de 2019, la Sra. Bosques se reunió personalmente con el querellante para discutir los asuntos levantados por éste en su correo electrónico del 3 de mayo de 2019.

21) El 1 de agosto de 2019, el querellante presentó una segunda queja en contra del Sr. Ortiz ante recursos humanos mediante correo electrónico.

22) El Sr. Ortiz no fue copiado por el querellante en el correo electrónico del 1 de agosto de 2010.

23) Entre el 3 de mayo y el 1 de agosto de 2019, el querellante no había presentado alguna otra queja en contra del Sr. Ortiz.

24) El miércoles[,] 7 de agosto de 2019, el querellante recibió su *Mid-Year Evaluation* para el año 2019 y fue colocado en un PIP.

25) El querellante acusó recibo de su PIP el mismo día en que lo recibió, a saber, [el] miércoles[,] 7 de agosto de 2019.

26) El querellante acusó recibió del *Mid Year Review* de 2019 al día siguiente, [el] jueves 8 de agosto de 2019.

27) El querellante se quejó del *Mid Year* y del PIP mediante correo electrónico del jueves[,] 8 de agosto de 2019.

28) El mismo jueves[,] 8 de agosto de 2019, la Sra. Bosques se reunió con el querellante para discutir su queja.

29) El viernes[,] 9 de agosto de 2019, el querellante no se reportó a trabajar.

30) El viernes[,] 9 de agosto de 2019, el querellante acudió a donde un médico, quien[,] a su vez[,] le recomendó [d]escanso.

31) Entre el 9 de agosto de 2019 y el 11 de agosto de 2019, el querellante utilizó y agotó su balance de días por enfermedad, y entre el 12 de agosto de 2019 y 11 de noviembre de 2019, estuvo utilizando su *"Short Term Disability"*.

32) El 21 de noviembre de 2019[,] el querellante renunció a su empleo.

33) El querellante sostuvo varias entrevistas de empleo con Lockheed Martin, la primera con el *"manager"* por teléfono, y la segunda con el *"Lead"* mediante Skype.

34) La segunda entrevista se llevó a cabo aproximadamente una semana después de haberse celebrado la primera.

35) Unos pocos días después, se celebró una tercera entrevista con la representante de recursos humanos de Lockheed Martin.

36) El 13 de septiembre de 2019, el querellante recibió una oferta de empleo como *"Data Engineer"* en Lockheed Martin.

37) El 14 de septiembre de 2019, el querellante retó (sic) los términos de su oferta de empleo con Lockheed Martin y el 17 de septiembre de 2019 recibió una oferta para la plaza de "*Senior Data Engineer*", la cual aceptó ese mismo día.

38) Como "*Senior Data Engineer*", el querellante comenzó a trabajar en Lockheed Martin con un ingreso que excedía los noventa y tres mil dólares ($93,000.00) anuales, el cual era mayor al que tenía en Honeywell en ese momento, y con beneficios marginales muy similares.

39) Para la fecha en que el querellante renuncia a su empleo en Honeywell, ya había aceptado empleo con su actual patrono, Lockheed Martin.

40) La Sra. Cruz fungió como la supervisora del querellante cuando fue inicialmente contratado.

41) La Sra. Cruz fue quien escogió al querellante entre los candidatos que solicitaron para la plaza que le fue ofrecida en Honeywell.

42) La Sra. Cruz fue quien suscribió la oferta de empleo que Honeywell le extendió al querellante.

43) La relación del querellante con la Sra. Cruz fue descrita por éste de la siguiente manera: "bien cordial" y de "respeto, cordial y adecuad[a]".

44) Tal y como reconoció el querellante durante su deposición, nunca tuvo "*issues*" en el empleo con la Sra. Cruz.

45) Como "*Sr. General Engineering Supervisor*", el Sr. Ortiz se encontraba bajo la dirección de la Sra. Cruz.

46) El querellante no cuestiona que el Sr. Ortiz fuese una persona muy conocedora de la cuestión técnica de su trabajo.

47) El querellante no fue notificado sobre su alegado bajo desempeño antes del 7 de agosto de 2019.

Insatisfecho, el 2 de octubre de 2024, Honeywell presentó una *Moción de Reconsideración*.[11] En resumen, la peticionaria sostuvo que el TPI denegó su solicitud de dictar sentencia sumaria al considerar controvertidos los treinta y seis (36) hechos que el señor De Jesús Olivencia se negó a admitir, aun cuando no presentó evidencia para refutarlos. Al respecto, Honeywell argumentó que el recurrido se valió de alegaciones conclusorias y especulaciones infundadas para derrotar los hechos para los cuales el peticionario entendía que no existía alguna controversia real, sustancial, ni genuina y que fundamentó mediante prueba sustancial. Por tal motivo, expuso que erró el TPI al resolver que existían nueve (9) asuntos en controversia que impedían resolver el pleito sumariamente. Sobre el primer y

---

[11] *Íd.*, Anejo 11, págs. 469-520.

quinto asunto, el peticionario argumentó que el señor De Jesús Olivencia no presentó evidencia admisible para demostrar que sus quejas fueron atendidas de manera irregular o imparcial por la señora Bosques del Departamento de Recursos Humanos de Honeywell. En torno al segundo asunto, el peticionario alegó que el señor De Jesús Olivencia no evidenció que fue humillado en presencia de sus compañeros, ya que no indicó cuándo ocurrió el alegado incidente, quiénes estaban presente ni qué se dijo.

Respecto al tercer asunto sobre el cual el TPI entendió que existía controversia, Honeywell aseveró que el recurrido no mostró que fue hostigado y acosado en su lugar de empleo. Al respecto, el peticionario adujo que la entrega del PIP como medida disciplinaria o correctiva no constituyó una conducta ilícita o ilegal de su parte. En lo concerniente al cuarto asunto, Honeywell enfatizó que no cuestionó que el acto de presentar una queja contra su supervisor ante recursos humanos es una actividad protegida. Asimismo, subrayó que dicho asunto es uno de estricto derecho que el Foro Primario debió atender.

En cuanto al sexto y noveno asunto que el Foro Primario consideró como controvertidos, Honeywell apuntó que un PIP no constituye una actividad adversa en el empleo ni una represalia. El peticionario argumentó que el PIP respondió a una razón legítima de negocio ante los presuntos problemas de desempeño del señor De Jesús Olivencia. A tal efecto, resaltó que los tribunales no deben intervenir en las determinaciones que realizan las empresas en el curso ordinario de sus operaciones.

Sobre el séptimo asunto, el peticionario alegó que si la renuncia del recurrido supuso un despido constructivo era un asunto de derecho que le correspondía resolver al TPI. Con relación al octavo asunto, Honeywell planteó que el TPI no contaba con base fáctica alguna que le permitiese concluir que estaba en controversia si la empresa le impuso condiciones onerosas al señor De Jesús Olivencia.

Esto, al concebir que no se le redujo el salario ni los beneficios del recurrido, no se le cambió su plaza y, además, se sustituyó su supervisor.

Honeywell argumentó que al no existir hechos materiales en controversia, al TPI le correspondía realizar el análisis correspondiente para establecer si se configuró un despido injustificado o si la empresa incurrió en represalias. Por otro lado, alegó que al señor De Jesús Olivencia se le debía imponer los gastos razonables que incurrió la empresa por negar las alegaciones de mala fe y con propósitos dilatorios, de conformidad con la Regla 36.7 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.7.

El 7 de octubre de 2024, el TPI emitió y notificó una Resolución en la que declaró No Ha Lugar a la solicitud de reconsideración del peticionario.

Ante su inconformidad con la determinación del TPI, el 6 de noviembre de 2024, Honeywell presentó un *Recurso de Certiorari* ante este Tribunal, en el que planteó que el TPI cometió los siguientes errores:

> **PRIMER ERROR:** ERRÓ EL TPI AL DENEGAR LA SOLICITUD DE SENTENCIA SUMARIA PRESENTADA POR HONEYWELL, PUES, NO EXISTE CONTROVERSIA REAL Y SUSTANCIAL CON RELACIÓN A LOS HECHOS PRESENTADOS POR HONEYWELL EN SU SOLICITUD DE SENTENCIA SUMARIA.
>
> **SEGUNDO ERROR:** ERRÓ EL TPI AL DENEGAR LA SOLICITUD DE SENTENCIA SUMARIA PRESENTADA POR HONEYWELL, PUES, NO EXISTE CONTROVERSIA CON RELACIÓN A LOS ASUNTOS QUE EL TPI ENUMERÓ COMO CONTROVERSIAS EN SU RESOLUCIÓN.
>
> **TERCER ERROR:** ERRÓ EL TPI AL NO DESESTIMAR SUMARIAMENTE LAS CAUSAS DE ACCIÓN DE DESPIDO INJUSTIFICADO Y REPRESALIAS.

En síntesis, el peticionario puntualizó que el Foro Primario incurrió en un claro error y manifiesto abuso de su discreción al encontrar como controvertidos aquellos hechos que el señor De Jesús Olivencia se negó a admitir en su oposición a dictar sentencia sumaria. Honeywell expuso que el mero hecho de que una parte se

niegue a admitir algún hecho no es suficiente para resolver que se controvirtió, en ausencia de documentación admisible. Sobre esto, Honeywell señaló que al cumplir con su obligación de sustentar los hechos con documentos admisibles y declaraciones bajo juramento, al recurrido le correspondía presentar declaraciones juradas o contra documentos que controvirtieran los mismos.

El peticionario reiteró que existían dos (2) razones para desestimar la causa de acción en su contra, siendo estas que el señor De Jesús Olivencia renunció a su empleo y que el motivo para ello fue aceptar un puesto similar en otra compañía con un mayor salario. Ante ello, razonó que no existía controversia de hecho que impidiera al TPI dictar sentencia sumaria, por lo que solicitó que este Tribunal examinara *de novo* su solicitud de sentencia sumaria, revocara la determinación del Foro Primario y declarara Con lugar su solicitud de sentencia sumaria.

El 12 de noviembre de 2024, emitimos una *Resolución* en la que le concedimos al señor De Jesús Olivencia un término de diez (10) días para presentar su oposición a la expedición del auto de *certiorari*, a tenor con la Regla 37 del *Reglamento del Tribunal de Apelaciones*, 4 LPRA Ap. XXII-B, R. 37.

Al transcurrir en exceso del aludido término, el 26 de diciembre de 2024, Honeywell presentó una moción para que este Foro adjudicara el recurso sin contar con la oposición del recurrido.

En atención a los errores señalados, procedemos a exponer la normativa jurídica aplicable a este recurso.

**II.**

**A. *Certiorari***

El *certiorari* es el vehículo procesal que permite que un tribunal de mayor jerarquía revise las determinaciones de un tribunal inferior. *Rivera et al., v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023); *Torres González v. Zaragoza Meléndez,* 211 DPR 821, 846-847

(2023); *Caribbean Orthopedics v. Medshape et al.*, 207 DPR 994, 1004 (2021); *McNeill Healthcare LLC v. Municipio De Las Piedras*, 206 DPR 391, 404 (2021); *800 Ponce de León v. AIG*, 205 DPR 163, 174 (2020); *Medina Nazario v. McNeill Healthcare LLC*, 194 DPR 723, 728 (2016); *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012). Mediante este recurso extraordinario se solicita la corrección de un error cometido por un foro inferior. *Torres González v. Zaragoza Meléndez*, *supra*, pág. 847. Contrario al recurso de apelación, el Tribunal de Apelaciones posee la facultad discrecional de expedir o denegar el recurso de *certiorari* toda vez que, de ordinario, se tratan de asuntos interlocutorios. *Íd.*

La Regla 52.1 de Procedimiento Civil, *supra*, R. 52.1, dispone taxativamente las instancias en las que este Tribunal ostenta autoridad para expedir el auto de *certiorari* sobre un asunto interlocutorio civil. *McNeill Healthcare LLC v. Municipio De Las Piedras, supra*; *Scotiabank de Puerto Rico v. ZAF Corporation, et als.*, 202 DPR 478 (2019). En lo pertinente, si el asunto interlocutorio planteado no se encuentra dentro de las instancias que el ordenamiento jurídico otorga autoridad para intervenir, no se puede atender la controversia. El referido artículo dispone que el foro apelativo intermedio solamente expedirá un recurso de *certiorari* relacionado a una resolución u orden bajo las Reglas 56 y 57 de Procedimiento Civil, *supra*, o a la denegación de una moción de carácter dispositivo. Véase Regla 52.1 de Procedimiento Civil, *supra*, R. 52.1. A su vez, a modo de excepción, este tribunal podrá revisar órdenes o resoluciones interlocutorias cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, privilegios evidenciarios, anotaciones de rebeldía, asuntos relativos a relaciones de familia, casos de interés público o cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. *Íd.*

El propósito de esta regla es evitar la dilación que causaría la revisión judicial de las controversias que podrían ser planteadas en un recurso de apelación. *Scotiabank de Puerto Rico v. ZAF Corporation, et als., supra*, pág. 486; *800 Ponce de León v. AIG, supra*, pág. 175; *Rivera Figueroa v. Joe's European Shop*, 183 DPR 580, 593-594 (2011). Ahora bien, "el hecho de que un asunto esté comprendido dentro de las materias susceptibles a revisión no justifica la expedición del auto sin más". *Medina Nazario v. McNeill Healthcare LLC, supra.*

Por otro lado, la Regla 40 del *Reglamento del Tribunal de Apelaciones, supra*, R. 40, establece los criterios que debemos considerar en el ejercicio discrecional de atender una petición de *certiorari*. A saber, este Tribunal debe considerar:

> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> (E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

En la eventualidad que se deniegue la expedición del auto de *certiorari*, no será necesario exponer las razones para tal determinación. *Rivera Figueroa v. Joe's European Shop, supra*, pág. 594; *IG Builders et al. v. BBVAPR, supra*, pág. 336. En tal circunstancia, este Tribunal no asume jurisdicción sobre el asunto planteado ni dispone del mismo en sus méritos. *Torres González v. Zaragoza Meléndez, supra*, pág. 848; *McNeill Healthcare LLC v. Municipio De Las Piedras, supra*, pág. 405.

**B. Sentencia Sumaria**

La sentencia sumaria es un mecanismo procesal que permite que un caso se disponga ágilmente, sin la celebración de un juicio, siempre que no se presenten controversias genuinas de hechos materiales. *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 993 (2024); *Birriel Colón v. Econo y otro*, 213 DPR 80, 90 (2023); *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 979 (2022); *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 334 (2021). A esos efectos, un hecho material es uno esencial y pertinente, que puede afectar el resultado de la reclamación conforme al derecho sustantivo aplicable. *Cruz, López v. Casa Bella y otros, supra*; *Banco Popular v. Posada*, 2024 TSPR 62, 213 DPR ___ (2024); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010); véase, además, Regla 36.1 de Procedimiento Civil, *supra*, R. 36.1. La controversia sobre el hecho material debe ser real. *Ramos Pérez v. Univisión, supra*. En otras palabras, la controversia debe ser de calidad suficiente para que sea necesario que el juzgador la dirima mediante un juicio plenario. *Íd.*

Cónsono con lo anterior, la Regla 36.3(e) de Procedimiento Civil, *supra*, R. 36.3 (e), establece que procede dictar una moción de sentencia sumaria si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas u otra evidencia demuestran que no existe una controversia real sustancial en torno a un hecho esencial y pertinente. Véase, además, *Birriel Colón v. Econo y otro, supra*; *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).

Ahora bien, no es aconsejable dictar sentencia sumaria cuando existe controversia sobre asuntos de credibilidad o sobre aspectos subjetivos como la intención, el propósito mental o la negligencia. *Cruz, López v. Casa Bella y otros, supra*; *Aponte Valentín et al. v. Pfizer Pharm.*, 208 DPR 263, 278 (2021). Resulta importante que "[l]os

tribunales, al examinar una moción de sentencia sumaria y declararla no procedente por alegadamente contener elementos subjetivos o de credibilidad, deben asegurarse que estos elementos sean un ingrediente esencial en la resolución de la controversia ante su consideración". *Carpets & Rugs v. Tropical Reps*, 175 DPR 615, 638 (2009). Empero, aun cuando se deben evaluar los elementos subjetivos o de intención, no se impide la utilización de la sentencia sumaria si de los documentos se desprende la inexistencia de una controversia real y sustancial sobre los hechos materiales. *Ramos Pérez v. Univisión, supra*, pág. 219; *Birriel Colón v. Econo y otro, supra*, pág. 91. Véase también Regla 36.3 (e) de Procedimiento Civil, *supra*, R. 36.3 (e). Así pues, procede dictar sentencia sumaria cuando el juzgador está claramente convencido de que tiene ante sí todos los hechos materiales de forma no controvertida y es innecesario celebrar una vista en los méritos. *Birriel Colón v. Econo y otro, supra.*

La parte que se opone a la solicitud de sentencia sumaria debe refutar los hechos materiales con evidencia sustancial. *SLG Fernández-Bernal v. RAD-MAN et al., supra*, págs. 336-337. Ahora bien, si la petición de sentencia sumaria está sustentada con declaraciones juradas u otra prueba, la parte que se opone no puede descansar en meras alegaciones, sino que debe contestar de una forma tan detallada y específica como lo haya hecho la parte promovente. *Birriel Colón v. Econo y otro, supra*; *Ramos Pérez v. Univisión, supra*, pág. 215; Regla 36.3 (c) de Procedimiento Civil, *supra*, R. 36.3 (c). Sin embargo, la ausencia de prueba para refutar la evidencia presentada no conduce a la concesión automática de una moción de sentencia sumaria. *Birriel Colón v. Econo y otro, supra*; *SLG Fernández-Bernal v. RAD-MAN et al., supra*, pág. 337.

En *Meléndez González et al. v. M. Cuebas, supra*, el Tribunal Supremo estableció un estándar que este Tribunal de Apelaciones

debe emplear al revisar las concesiones o denegatorias de una solicitud de sentencia sumaria.

En primer lugar, este Tribunal se encuentra en la misma posición que el Foro Primario al revisar una solicitud de sentencia sumaria, por lo que está llamado a realizar una revisión *de novo*, conforme con la Regla 36 de Procedimiento Civil, *supra*, R. 36. En tal ejercicio, no se puede considerar evidencia que no se presentó ante el Foro *a quo*, y se debe examinar el expediente de la forma más favorable hacia la parte opositora de la moción de sentencia sumaria. *Meléndez González et al. v. M. Cuebas, supra*, pág. 116.

En segundo lugar, el Tribunal de Apelaciones debe revisar que tanto la petición de sentencia sumaria como su oposición cumplan con los requisitos de la Regla 36 de Procedimiento Civil, *supra,* R. 36 y los criterios discutidos en los casos *SLG Zapata- Rivera v. J.F. Montalvo, supra* y *Meléndez González et al. v. M. Cuebas, supra*.

En tercer lugar, el Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. *Íd.* De haberlos, se debe exponer los hechos materiales en controversia y los incontrovertidos, a tenor con la Regla 36.4 de Procedimiento Civil, *supra,* R. 36.4. Véase *Meléndez González et al. v. M. Cuebas, supra*.

En cuarto lugar, si el Tribunal de Apelaciones determina que no existen hechos materiales en controversia, procederá a revisar si el Foro Primario aplicó correctamente el derecho. *Íd.*, pág. 119.

### C. Despido injustificado

El Estado tiene un interés apremiante en regular las relaciones obrero-patronales con el fin de evitar prácticas injustas de trabajo e implementar una clara política pública de protección de los derechos de los empleados. *Díaz v. Wyndham Hotel Corp.,* 155 DPR 364, 374 (2001). Así, pues, la *Ley de indemnización por despido sin justa causa, supra,* tiene el propósito de desalentar los despidos injustificados y las actuaciones arbitrarias contra los empleados mediante la

imposición de remedios económicos. *Ruiz Mattei v. Commercial Equip. Fin., Inc.*, 2024 TSPR 68, 214 DPR ___ (2024); *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019). En dicha legislación se incorporó el estándar de justa causa como limitación a todo despido. *Díaz v. Wyndham Hotel Corp., supra,* págs. 374-375. Es decir, no existe una prohibición absoluta en contra del despido, ya que el patrono puede plantear la defensa de justa causa. *Íd.; Rodríguez Gómez v. Multinational Ins.*, 207 DPR 540, 549 (2021); *Romero et als. v. Cabrer Roig et als.,* 191 DPR 643, 651 (2014).

En tal sentido, el Artículo 1 de la *Ley de indemnización por despido sin justa causa, supra,* sec. 185a, establece que todo empleado que trabaje mediante remuneración, contratado sin tiempo determinado y que fuere despedido sin que haya mediado justa causa tendrá derecho a recibir una indemnización o mesada por el tiempo trabajado para el patrono. *Ortiz Ortiz v. Medtronic, supra,* pág. 771; *Rodríguez Gómez v. Multinational Ins., supra,* págs. 549-550.   Sin embargo, para que el empleado pueda aprovecharse de la presunción de despido injustificado, tiene el peso de la prueba inicial para demostrar que, ciertamente, fue despedido. *Rivera Figueroa v. The Fuller Brush Co.,* 180 DPR 894 (2011). Para efectos de la *Ley de indemnización por despido sin justa causa, supra,* se entenderá por despido lo siguiente:

> además de la cesantía del empleado, su suspensión indefinida o por un término que exceda de tres (3) meses, excepto en el caso de empleados de industria y negocios estacionales, o la renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra.
>
> Disponiéndose que los actos dirigidos a inducir o forzar a un empleado a renunciar solamente constituyen un despido cuando la única alternativa razonable que le queda al empleado es la de abandonar el cargo. No basta con cualquier molestia o condición antipática en el empleo, sino que debe tratarse de actuaciones patronales arbitrarias, irrazonables y caprichosas que generen una atmósfera hostil para el empleado que impidan del todo su estadía sana en el trabajo y que sean originadas por un motivo ajeno al legítimo interés

del patrono de salvaguardar el bienestar de la empresa. Cuando se trate de vejámenes o humillaciones, éstos deben ser de magnitud sustancial.

La mera alegación del empleado de que fue forzado a renunciar no será suficiente para probar o establecer que fue despedido. El empleado deberá demostrar los hechos concretos que establezcan que las gestiones patronales tuvieron la intención de lesionar o perjudicar su condición de empleado. Artículo 5 de la *Ley de indemnización por despido sin justa causa, supra*, sec. 185e.

Así, pues, la definición de despido abarca no solamente la acción unilateral del patrono en cesantear al empleado, sino las acciones dirigidas a forzarlo a renunciar como someterlo a vejámenes o humillaciones, ya sea de hecho o de palabra. *Rivera Figueroa v. The Fuller Brush Co., supra*, pág. 907. Esta modalidad de despido se conoce como despido constructivo. *Íd.*

### D. Despido constructivo

Por otro lado, el despido constructivo se refiere a los actos voluntarios e injustificados de un patrono encaminados a obligar al empleado a tener como única alternativa razonable abandonar el empleo. *Íd.*, pág. 908. *Vélez de Reilova v. R. Palmer Bros., Inc.*, 94 DPR 175, 178 (1967). Es decir, mediante la imposición de condiciones onerosas, el patrono obliga al empleado a renunciar. *Rivera Figueroa v. The Fuller Brush Co., supra*, pág. 907.

En la causa de acción de despido injustificado concurren dos (2) elementos básicos: (1) que el patrono incurrió en acciones de considerable seriedad y (2) que el empleado no tuvo otra alternativa que renunciar o que, aunque el empleado tuviese otra alternativa que no fuese la renuncia, el patrono propició una condición de riesgo inminente para su vida o salud. *Figueroa Rivera v. El Telar, Inc.*, 178 DPR 701, 711-712 (2010). Dichas actuaciones patronales deben responder a un motivo ajeno al legítimo interés de salvaguardar el efectivo desempeño en el empleo. *Íd.*, pág. 712.

No obstante, no basta una mera alegación de que la renuncia constituyó un despido constructivo. *Rivera Figueroa v. The Fuller*

*Brush Co., supra,* pág. 909. A su vez, el empleado no puede alegar cualquier condición antipática en el empleo o cualquier molestia, sino que el ambiente laboral se tornó a un nivel de intolerancia que la renuncia era la única alternativa razonable. *Íd.*, pág. 908; *León Torres v. Rivera Lebrón,* 204 DPR 20, 39 (2020). Además, los vejámenes y las humillaciones deben ser de magnitud sustancial. *Íd.* La evaluación de la magnitud y el impacto de las acciones de un patrono no se evalúan desde la óptica subjetiva del empleado, sino en función de si una persona razonable se sentiría forzada a renunciar como consecuencia de dichas acciones. *Íd.*; *León Torres v. Rivera Lebrón, supra.* En tal ejercicio, se consideran los siguientes factores: (1) la situación económica de la empresa; (2) los cambios que se implementaron en la empresa; (3) el desempeño y la eficiencia del empleado; (4) el nivel de compensación del empleado; (5) las condiciones laborales de otros empleados; (6) la antigüedad del empleado, y (7) las razones del patrono para justificar su actuación. *Figueroa Rivera v. El Telar, Inc., supra.*

### E. Represalias en el empleo

En otro extremo, la *Ley contra el despido injustificado o represalias a todo empleado por ofrecer testimonio ante un foro legislativo, administrativo o judicial, supra,* (*Ley contra represalias*) provee una protección a los empleados frente a las represalias que pueda tomar su patrono en su contra por proveer testimonio, expresión o información verbal o escrita ante un foro judicial, legislativo o administrativo. *SLG Rivera Carrasquillo v. AAA,* 177 DPR 345, 361 (2009); *Ocasio v. Kelly Servs.,* 163 DPR 653, 684 (2005). A saber, el Artículo 2 (a) de la *Ley contra represalias, supra,* sec. 194b, dispone que:

> Ningún patrono podrá despedir, amenazar o discriminar contra un empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información

ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, verbalmente o por escrito, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

Se otorga una causa de acción al empleado que es despedido, amenazado o discriminado en el empleo por realizar la actividad protegida. *SLG Rivera Carrasquillo v. AAA*, *supra*. El Artículo 2 (c) de la *Ley contra represalias*, *supra*, sec. 194b, establece dos (2) vías que el empleado tiene disponible para establecer una causa de acción por represalias. *Velázquez Ortiz v. Mun. de Humacao*, 197 DPR 656, 671 (2017). El empleado puede probar una violación de la ley mediante evidencia directa o circunstancial, o puede establecer un caso *prima facie* de represalias demostrando que participó en una actividad protegida y subsiguientemente fue despedido, amenazado o discriminado. *Íd.* Es decir, la acción adversa del patrono ocurrió al poco tiempo de haber incurrido en la actividad protegida. *Íd.*; *Rivera Menéndez v. Action Services*, 185 DPR 431, 446 (2012); *Feliciano Martes v. Sheraton*, 182 DPR 368, 399-400 (2011). Sin embargo, "en aquellos casos en que la proximidad temporal no sea el factor más adecuado para establecer una relación de causalidad, el empleado puede recurrir a cualquier otra evidencia que obre en el expediente y que tienda a demostrar la existencia de un nexo causal". *Velázquez Ortiz v. Mun. de Humacao*, *supra*, pág. 671.

Esbozada la normativa jurídica, procedemos a aplicarla a los hechos que nos conciernen.

**III.**

En el presente caso, Honeywell planteó que erró el TPI al denegar su solicitud de sentencia sumaria y al no desestimar las causas de acción de despido injustificado y represalias en su contra. Esto, al considerar que no existía una controversia real y sustancial

sobre los hechos materiales ni sobre los asuntos que el Foro Primario enumeró como controvertidos.

Como cuestión de umbral, nos corresponde revisar *de novo* tanto la solicitud de sentencia sumaria presentada por Honeywell como la oposición presentada por el señor De Jesús Olivencia y evaluar la prueba documental que se presentó ante el TPI. En tal ejercicio, concluimos que ambas partes cumplieron con la Regla 36 de Procedimiento Civil, *supra*, R. 36, en término de los requisitos de forma de sus escritos.

Sin embargo, de una lectura a la oposición presentada por el señor De Jesús Olivencia, resolvemos que dicha parte no logró rebatir los hechos materiales y esenciales que Honeywell presentó en su solicitud de sentencia sumaria, los cuales eran sustanciales y permiten alcanzar la determinación de desestimar la *Querella*. Resulta importante puntualizar que los hechos que el recurrido entendió como controvertidos podían ser corroborados mediante la prueba presentada por las partes, más no versaron sobre asuntos de credibilidad, intención, propósito mental o negligencia para requerir un juicio plenario. Considerados individual y conjuntamente, los hechos expuestos como controvertidos no eran esenciales para la resolución del pleito, máxime cuando de los documentos se desprende la inexistencia de una controversia real y sustancial sobre los hechos materiales de este caso.

A saber, en su *Querella*, el señor De Jesús Olivencia alegó esencialmente que su supervisor, el señor Ortiz, lo sometió a vejámenes y humillaciones que provocaron un deterioro en su condición de hipertensión y que posteriormente presentó la renuncia. Asimismo, arguyó que Honeywell lo sometió a un procedimiento de PIP como represalia por quejarse de las acciones de su supervisor en el Departamento de Recursos Humanos.

Por su parte, la peticionaria demostró en su solicitud de sentencia sumaria, que el señor De Jesús Olivencia no fue despedido, sino que renunció por previamente haber aceptado una oferta de empleo con otra empresa por un mayor salario. Por otro lado, se demostró que el señor De Jesús Olivencia envió un correo electrónico mediante el cual se quejó de las acciones de su supervisor. Sobre el particular, el propio recurrido confirmó que su supervisor nunca se dirigió hacia su persona con palabras soeces ni le faltó el respeto, sino que su queja era por la forma de supervisar. Como resultado de la investigación realizada por la señora Bosques del Departamento de Recursos Humanos, se reflejó que no existían quejas mayores en cuanto al señor Ortiz, aunque se le requirió tomar un curso de comunicación asertiva. Además, se estableció que Honeywell removió al señor Ortiz como supervisor del peticionario, previo a que este renunciase a su empleo. Consecuentemente, el señor De Jesús Olivencia iba a ser supervisado por la señora Cruz, con quien este mantenía una relación cordial.

A su vez, Honeywell demostró que, en vista de que el señor De Jesús Olivencia experimentó problemas con sus tareas de *MAT Weekly with Monthly FCS*, *Tableau*, *Pricing Database*; y *NPD BI Flawless Lauch Database & Dashboard for PP&C*, el 7 de agosto de 2019 se le informó que fue colocado un PIP, el cual era un plan de mejoramiento. A pesar de lo anterior, quedó establecido que al recurrido no se le cambió de puesto, no se le alteró su salario, sus beneficios ni sus responsabilidades.

De los propios hechos admitidos por el recurrido se demuestra que su renuncia no constituyó un despido injustificado o un despido constructivo, ni que las acciones de la empresa representaron una represalia. A saber, para que el señor De Jesús Olivencia estableciera que Honeywell lo sometió a vejámenes o humillaciones que lo forzaran a renunciar, no podía meramente alegar dicho hecho sin

exponer un ápice de sucesos concretos y fundamentados que establecieran las condiciones onerosas o las gestiones que realizó el patrono con la intención de lesionarlo o perjudicarlo. Véase Artículo 5 de la *Ley de indemnización por despido sin justa causa, supra,* sec. 185e. Es importante subrayar que colocar a un empleado en un plan de mejoramiento con el interés de salvaguardar el desempeño en el empleo no implicó una acción patronal que propiciara una condición de empleo de un nivel de intolerancia que expusiera en riesgo la vida o salud del empleado al punto que no le otorgara más opción que renunciar. Adicionalmente, el señor De Jesús Olivencia no presentó evidencia directa ni circunstancial para demostrar un nexo causal entre la acción de presentar una queja contra su supervisor en el Departamento de Recursos Humanos de Honeywell y que subsiguientemente haya sido despedido, amenazado o discriminado.

Por todo lo anterior, el TPI no estaba impedido de disponer del caso sumariamente. Así las cosas, corresponde expedir el auto de *certiorari,* revocar la determinación recurrida y desestimar el pleito sin la necesidad de celebrar una vista en su fondo, puesto que de los documentos se demostraba que las causas de acción del señor De Jesús Olivencia no se sostienen en derecho, al no haber sido despedido, y por las demás razones expuestas previamente.

**IV.**

Por los fundamentos que anteceden, se expide el auto de *certiorari* y se revoca la *Resolución* recurrida. Consecuentemente, se desestima la *Querella* presentada por el señor De Jesús Olivencia en contra del Honeywell.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones